natural consequence of the use of such strong marks, a plaintiff using a strong mark need not prove secondary meaning. See Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc., 659 F.2d 695, 702 (5th Cir.1981), cert. denied, 457 U.S. 1126 (1982).

*5 Use of the terms strong and weak does not mean that there are but two categories of trademarks. On the contrary, the strength or weakness of a particular mark is measured on a spectrum or continuum. See, e.g., Miller Brewing Co. v. G. Heileman Brewing Co., 501 F.2d 75, 79 (7th Cir.1977), cert. denied, 434 U.S. 1025 (1978). The spectrum begins at the weak end with generic or commonly descriptive terms and runs through merely descriptive terms to suggestive terms to, at the strong end of the spectrum, arbitrary or fanciful terms. Id. See also Walt-West Enterprises, Inc. v. Gannett Co., Inc., 695 F.2d 1050, 1055-56 (7th Cir.1982).

The same principles apply to trade dress. Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc., 659 F.2d 695, 702 (5th Cir.1981), cert. denied, 457 U.S. 1126 (1982). See also Prufrock Ltd. v. Lasater, No. 85-1024, slip op. (8th Cir. Jan. 6, 1986). Trade dress, like trademarks, may be strong or weak. Similarly, trade dress may be descriptive or arbitrary. See generally Sicilia Di R. Biebow & Co. v. Cox, 732 F.2d 417, 426 (5th Cir.1984). Trade dresses also exist on a spectrum running from the weak to the strong. If the trade dress is strong, then secondary meaning need not be proved. On the other hand, a trade dress may be weak and thus require proof of secondary meaning. Id. at 425; Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc., 659 F.2d 695, 702 (5th Cir.1981), cert. denied, 457 U.S. 1126 (1982).

With this discussion in mind, the court turns to a discussion of the pleadings in this case. Plaintiffs have neither pled nor argued that their trade dress is sufficiently distinctive to alleviate the need to plead and prove secondary meaning. Rather, plaintiffs state that they must prove secondary meaning. They argue that they have pled that required element of proof here.

The court cannot agree with plaintiffs' conclusion. The court has not found even a conclusory allegation of secondary meaning in plaintiffs' second amended complaint. Plaintiffs have not directed the court to any statement in the complaint that would contradict the court's conclusion. Consequently, the court will dismiss plaintiffs' complaint under Rule 12(b)(6).

II

ATM has moved, in the alternative, for partial summary judgment as to Count II of plaintiffs' second amended complaint. Although the court's decision on ATM's motion to dismiss alleviates the need to discuss ATM's motion for summary judgment, the court will, nevertheless, discuss that part of ATM's motion. ATM puts forward three ostensibly undisputed �facts� that, according to ATM, entitle it to partial summary judgment. This court will discuss each of ATM's facts separately.

ATM's first fact is that neither plaintiff, Spartan Ohio or Spartan Lebanon, has ever used the trade dress at issue here in the United States. To establish that Spartan Ohio has never used the trade dress at issue in the United States, ATM relies on the deposition of Sharon Elfring (�Elfring�), Spartan Ohio's international correspondent. ATM contends that Elfring testified during her deposition that the trade dress used by Spartan Lebanon in Saudi Arabia is different from the trade dress used by Spartan Ohio in 1958 and has never been used in the United States.

*6 The court has reviewed those portions of the Elfring deposition relied on by ATM and concludes that it cannot agree with ATM's reading of that deposition. Indeed, at one point Elfring testified that Spartan Lebanon, with the addition of the term �Flash�, was using the exact same trade dress in Saudi Arabia as had been used by Spartan Ohio in the United States. ATM's selective reading of the Elfring deposition does not establish either an undisputed fact or a basis for partial summary judgment.

As to Spartan Lebanon, the evidence of record establishes that Spartan Lebanon has never used the trade dress at issue in the United States. ATM's argument seems to be either that this court does not have subject matter jurisdiction over this case or that Spartan Lebanon does not have standing under the Lanham Act. If ATM's argument is the former, this fact does not change the court's conclusion reached in discussing ATM's motion to dismiss. Indeed, under the factors to be considered by the court in determining extraterritorial application of the Lanham Act, Spartan Lebanon's failure to use the trade dress at issue in the United States does not even enter the analysis. See American Rice, Inc. v. Arkansas

*Rice Growers Coop Ass'n.*, 701 F.2d 408, 414 (5th Cir.1983).

If ATM's argument is that Spartan Lebanon does not have standing to bring this suit under the Lanham Act, then ATM's argument is unpersuasive. The general rule is that foreign nationals have standing to sue United States nationals under Section 43(a). *See, e.g., Noone v. Banner Talent Associates, Inc.*, 398 F.Supp. 260, 262 (S.D.N.Y.1975). ATM has not presented any reason why the general rule should not apply to the facts of this case.

ATM's second undisputed fact is that because neither Spartan Ohio nor Spartan Lebanon has ever used the disputed trade dress in the United States, ATM has a legal right to use the trade dress in the United States. ATM's theory is that this court does not have subject matter jurisdiction over this action unless ATM's activities create a likelihood of confusion in the United States. Because ATM has a legal right to use the trade dress in the United States, no likelihood of confusion in the United States can possibly exist.

ATM is in error. First, ATM has not established that Spartan Ohio has never used the trade dress in the United States. It's failure to establish this fact means that ATM has not established the legal right to use the trade dress in the United States. Further, ATM's theory conflicts with established case law. The court's subject matter jurisdiction is not limited to cases in which a likelihood of confusion exists in the United States. So long as the court finds that it has subject matter jurisdiction over the action under the established three factor test, the court can consider the likelihood of confusion anywhere. *See, e.g., American Rice, Inc. v. Arkansas Rice Growers Coop Ass'n.*, 701 F.2d 408 (5th Cir.1983). *See also Scotch Whisky Ass'n. v. Barton Distilling Co.*, 489 F.2d 809 (7th Cir.1973).

*7 ATM's last undisputed fact is that the dispute here concerns the likelihood of confusion in Saudi Arabia between products marketed by two companies, ATM and Spartan Lebanon, that are both foreign nationals to Saudi Arabia. ATM argues that Congress never intended for the Lanham Act to have extraterritorial application to an alleged likelihood of confusion in a foreign jurisdiction between two companies that are foreign nationals to that foreign jurisdiction.

Again, ATM's argument must fail. ATM has not made any citations to the legislative history of the Lanham Act. Consequently, ATM's unilateral assertions as to Congressional intent are simply unsupported. Further, at least one court has considered a similar dispute and found that the Lanham Act had extraterritorial application. *See American Rice, Inc. v. Arkansas Rice Growers Coop Ass'n.*, 701 F.2d 408 (5th Cir.1983).

For the foregoing reasons, it is hereby ordered that ATM's motion to dismiss under Rule 12(b)(6) is granted. Plaintiffs will be given another opportunity to file a legally sufficient complaint. Plaintiffs have twenty-one (21) days to file their third amended complaint. Hy-Trous/Flash Sales' motion to intervene will be stayed until plaintiffs' have filed their third amended complaint.

N.D.Ill.,1986.
Spartan Chemical Co., Inc. v. Atm Enterprises of America
Not Reported in F.Supp., 1986 WL 2616 (N.D.Ill.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 148567 (S.D.Ind.), 65 USLW 2694
(Cite as: Not Reported in F.Supp.)

United States District Court, S.D. Indiana, Indianapolis Division.
RESUSCITATION TECHNOLOGIES, INC., Plaintiff,
v.
CONTINENTAL HEALTH CARE CORP., Joseph L. Falkson, and Ronald M. Stone, Defendants.
No. IP 96-1457-C-M/S.

March 24, 1997.

Philip A. Whistler, Ice Miller Donadio & Ryan, Indianapolis, IN.
Sean M. Clapp, Thomas G. Burroughs, Johnson Smith Pence Densborn Wright & Heath, Indianapolis, IN.

ORDER ON MOTION TO DISMISS

MCKINNEY, District Judge.

*1 This matter pends on the defendants' motion to dismiss. Defendants assert that this Court does not have jurisdiction over them because they have not appeared at any time in Indiana. As additional support for their argument, they offer that the plaintiff, Resuscitation Technologies, Inc. ("RTI") initiated the contact with them through RTI's interactive Web site. FN1

> FN1. The "Web" or "World Wide Web" is a collection of sites available on the Internet. A site is an Internet address use for purposes of exchanging information with a host computer. See Bensusan Restaurant Corp. v. King, 937 F.Supp. 295 (S.D.N.Y.1996).

Affidavits from defendants Joseph L. Falkson ("Falkson") and Ronald L. Stone ("Stone"), and plaintiff's president, Mark E. Brauner ("Brauner"), along with various letters and documents filed by the parties, as well as the allegations of the amended complaint, provide the factual basis for the Court's discussion. In the absence of an evidentiary hearing, the Court must view the submitted materials in a light most favorable to the party seeking assertion of jurisdiction-here, RTI. See Logan Production, Inc. v. Optibase, Inc., 103 F.3d 49, 52 (7th Cir.1996) (citing Turnock v. Cope, 816 F.2d 332, 333 (7th Cir.1987); Compuserve, Inc. v. Patterson, 89 F.3d 1257, 1262 (6th Cir.1996) (noting that plaintiff meets the burden by making only a *prima facie* showing of jurisdiction.). In fact, when considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), the court must not weigh the conflicting assertions of the parties. Compuserve, 89 F.3d at 1262. Rather, all relevant factual disputes must be resolved in favor of the party invoking the court's jurisdiction. Logan Prod, 103 F.3d at 52.

The Court has been fully briefed on the issues in this matter and finds an evidentiary hearing unnecessary to resolve the pending motion. The Motion to Dismiss, or alternatively to transfer, is DENIED. The Court will exercise personal jurisdiction over the defendants and it has subject matter jurisdiction by virtue of the parties' diversity and satisfaction of the amount in controversy requirement. Moreover, it is not an abuse of the Declaratory Judgment Act to have brought this action for declaratory and injunctive relief, and venue is proper in the Southern District of Indiana. The parties are to proceed accordingly in the prosecution of this action.

I. FACTUAL AND PROCEDURAL BACKGROUND

As the sole shareholder of defendant Continental Health Care Corp. ("Continental"), Falkson asserts that neither he nor Continental own property in Indiana, nor do either conduct business in Indiana. Moreover, Falkson states that he first became aware of RTI in June of 1996 while searching the Internet for investment opportunities. He saw plaintiffs open posting on an interactive Web site, which was addressed to the public and indicated that RTI was an Indiana start-up company in the medical device field, and in need of capital. Falkson responded to the posting by electronic

mail on June 5, 1996, requesting further information. According to Falkson, this important fact indicates that neither he nor any other defendant purposefully availed themselves of the privilege of doing business in Indiana. In support of this conclusion, the defendants place great emphasis on their contention that RTI solicited their business, not the other way around.

*2 After the initial contact by Falkson, he and RTI corresponded by electronic mail, telephone, and regular mail throughout the summer of 1996. Plaintiff asserts, and Falkson does not dispute, that their communications included some eighty electronic mail messages. Documents were faxed back and forth, and several conference calls were held. Falkson and Brauner, RTI's president, met face to face twice, once in Michigan and once in New York. Within a month of Falkson's first contact with him, Brauner sent Continental a copy of RTI's business plan, which he deemed confidential, as well as other confidential and proprietary information. Falkson signed a confidentiality agreement on June 18, 1996, to facilitate Brauner's willingness to transfer this information. Another confidentiality and non-circumvention agreement was entered by Falkson, Stone and Brauner in August, 1996. This second agreement endeavored to encourage RTI's disclosure of any confidential and proprietary information relating to its exclusive licensing agreement with a Michigan company that owned a patent on another cardiac resuscitation device. RTI considered this agreement, and its exclusive relationship with the Michigan firm, to be valuable assets. After both parties signed the second confidentiality agreement, Falkson, Brauner, and Continental's medical consultant, Victor Alexander (�Alexander), met with officers of the Michigan patent owner. The purpose of the visit was to renegotiate and restructure the license agreement in a way that reduced RTI's financial obligations while it attempted to acquire capital.

Before the Michigan meeting, a draft of a letter of intent had been forwarded to Brauner, in which the parties indicated their contemplated intention of combining their resources to form a joint enterprise that would acquire the necessary capital through a newly-formed company, Newco. FN2 The plan was that Brauner would assign all of his patents or other intellectual property to Newco, in exchange for Newco paying what RTI owed to third parties as indicated in its business plan. �Falkson/Stone� would work with Brauner to restructure the terms of the license Brauner had from the Michigan company. The plan also contemplated that Brauner would be paid a monthly fee by Newco, �to commence at the closing of the agreement between himself and Falkson/Stone,� up to a total of $25,000.00, after which his salary as CEO of Newco's initial operating division will accrue until the contemplated initial public offering (�IPO�) closes. FN3 Plf's Exh. E. Falkson/Stone expressed an intent to create the new company, Newco, and undertake an IPO of its stock, providing any necessary funds for the project. They anticipated receiving $10-15 million for the IPO. Although Falkson/Stone would control the Newco board of directors, Brauner would be appointed to it and receive one vote. Id.

> FN2. According to Falkson, he, Stone and Brauner were planning to form a company to market, develop and finance the medical technology related to RTI's patents. Falkson Aff. ¶ 14.

> FN3. Brauner was also to receive a signing bonus, performance-based bonuses, a one year consultancy following termination of the contract, a one-time grant of fully-vested Founders Stock in Newco equal to 1.25% of the total issued stock, and the right to receive periodic grants of stock options. Plf's Exh. E.

To retain the license from the Michigan patent owner, RTI had to make a $50,000.00 payment by October 31, 1996. Am Compl. ¶ 15. Falkson and Stone continued to assure Brauner that they could raise money in ninety to 120 days by an IPO, nevertheless Brauner became uncomfortable with the delays. FN4 On October 7, 1996, Brauner informed Falkson/Stone that he and RTI were �terminating negotiations� with them, and asked them to return the confidential information he had sent them. Am. Comp. ¶ 17. In his faxed and electronically mailed letter, Brauner wrote that he had decided to decline their offer to become the first operating unit of their new company. Plfs' Exh. I. In response, Continental and Falkson wrote that Brauner's actions had breached his agreement with them, and that they intended to vigorously protect their rights, even if they had to sue him. Plfs' Exh. J. Falkson also claimed that since Brauner had breached their agreement, Continental and Falkson no longer were bound by the confidentiality and non-circumvention agreements. Id.

> FN4. On October 4, 1996, Stone wrote to Brauner indicating that he had been told by the medical advisor that Brauner �did not know what [he] wanted to do and wanted to wait until October 14th to decide.� Plfs' Exh. H. As a result, Stone indicated he would cease work on the project, but gave Brauner a two day deadline to reactivate the project. Id.

\*3 The next day, October 8, 1996, an attorney claiming to represent Falkson and Stone faxed Brauner a letter indicating that he would bring suit against RTI and Brauner unless all outstanding issues were resolved by October 11, 1996. RTI filed this action on October 11, 1996, seeking a declaratory judgment that the relationship between the parties did not amount to a contractual one, a preliminary injunction, and damages for breach of the confidentiality agreements, intentional interference with business relationship, and conversion. FN5 On November 22, 1996, defendants moved to dismiss the action for lack of personal jurisdiction, among other things. See Fed.R.Civ.P. 12(b)(2).

> FN5. By October 30, 1996, Continental and Berndale Management Corp., Stone's consulting firm, filed suit against Brauner and RTI in state court in New York, seeking $3 million in damages on theories of unjust enrichment and quantum meruit. Plfs' Exh. M.

## II. DISCUSSION

Defendants, having moved for dismissal for lack of personal jurisdiction, force RTI to demonstrate a basis for the Court's exercise of personal jurisdiction. *Simpson v. Quality Oil Co.,* 723 F.Supp. 382, 386 (S.D.Ind.1989). RTI can shift this burden by establishing a *prima facie* case that jurisdiction is proper. *Id.* To determine whether the exercise of personal jurisdiction is proper, a court may receive and consider affidavits and other documentary evidence. *Curtis Management Group v. Academy of Motion Picture Arts,* 717 F.Supp. 1362, 1364 (S.D.Ind.1989). All facts and reasonable inferences are to be viewed in a light most favorable to the nonmoving party, *Simpson,* 723 F.Supp. at 386, and all factual disputes are to be resolved in favor of the nonmoving party, *Curtis Management Group,* 717 F.Supp. at 1364.

In a diversity case, a district court has jurisdiction over a non-resident defendant only if a court of the state in which the district court sits would have jurisdiction. *Wilson v. Humphreys (Cayman) Ltd.,* 916 F.2d 1239, 1243 (7th Cir.1990), *cert. denied,* 499 U.S. 947, 111 S.Ct. 1415, 113 L.Ed.2d 468 (1991). For a court to have jurisdiction, both the state statute and the constitutional guarantee of due process must allow the court to exercise jurisdiction over the person. *Wilson,* 916 F.2d at 1243. In Indiana, however, the state long-arm statute extends personal jurisdiction to the limit of the due process clause, and thus, the only consideration is whether an exercise of jurisdiction complies with due process. *Id.*

Due process requires that a defendant have minimum contacts with the forum so that maintaining the suit does not offend "traditional notions of fair play and substantial justice." *Wilson,* 916 F.2d at 1243 (quoting *IntenanionalShoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). These minimum contacts must be established by a defendant's purposeful acts. *Id.* There are two types of personal jurisdiction that can be established by a defendant's minimum contacts with a forum: specific or general. *Id.* at 1244. Plaintiff does not urge that general jurisdiction exists in the case at bar.

Specific jurisdiction is present if the defendant has contacts from which the cause of action arises, and which constitute at least the minimum level of contact with the forum that allows the exercise of jurisdiction to be reasonable. *Helicopteros Nacionales de Columbia v. Hall,* 466 U.S. 408, 414, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *see also* 4 Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure 296 (2d ed., 1987). The constitutionality of jurisdiction does not depend on a determination of which of the parties to the controversy initiated the contact. *Logan Productions, Inc. v. Optibase, Inc.,* 103 F.3d 49, 53 (7th Cir.1996). Instead, determining who "started it" is just "one helpful factor in the jurisdiction equation." *Id.* Nor are defendants required to have "physically enter[ed] the forum state." *Burger King v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1986). It is enough if the nonresident defendant intentionally transacted business in the forum state for a court to find sufficient minimum contacts to subject it to personal jurisdiction. *Logan Prod,* 103 F.3d at 53.

\*4 To transact business in this day of instantaneous interstate electronic transmissions does not require a defendant to have physically entered the state. See *Zippo,* 1997 WL 37657 at \*4, 6 (citing *Burger King v. Rudzewicz,* 471 U.S. 462, 476, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)). In fact, in modern commercial life, "it is an inescapable fact ... that a substantial amount of commercial business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence...." *Burger King,* 471 U.S. at 476. In *Zippo,* the court was being asked

to determine whether the defendant's ◆conducting of electronic commerce◆ with a state's residents constitutes purposeful availment of doing business in that state. *Id.* The court ruled that it did, primarily by analyzing the ◆intended object◆ of the transmissions. *Id.* Because the object of the defendant was to assign passwords and sell its Internet news service to residents of the forum state, the court found that its intended object was to transact business in that state. As another court has noted,

[B]usiness is transacted in a state when obligations created by the defendant or business operations set in motion by the defendant *have a realistic impact on the commerce of that state;* and the defendant has purposefully availed himself of the opportunity of acting there if he should have reasonably foreseen that the transaction would have consequences in that state.

Compuserve, Inc. v. Pattern, 89 F.3d 1257, 1265 (6th Cir.1996) (quoting Southern Mach. Co. v. Mohasco Indus., 401 F.2d 374, 381 (6th Cir.1968)) (emphasis added).

As indicated by the decision in *Zippo,* this notion of transacting business over the Internet involves examining the level of interactivity, and the commercial nature of the exchange of information that occurs. Zippo, 952 F.Supp. 1119, 1997 WL 37657 at *4. The quality of those electronic contacts is measured with reference to the intended object of that activity. This process is particularly important when, as here, the dispute is about whether or not a contract was formed between two parties by reason of their use of the Internet or other electronic transmissions. Such a dispute is analogous analytically to a dispute over possible trademark infringement, such as in Compuserve, Inc., 89 F.3d 1257 and Zippo, 952 F.Supp. 1119, 1997 WL 37657, or fraud, as in Logan Prod, 103 F.3d 49, or defamation, as in Edias Software Inter. LLC v. Basis Inter. Lid, 65 LW 2471, 2 BNA's Elect. Infor. Pol. & Law Rep. 59 (D.Ariz.1996). Each of these types of cases have a common factual inquiry that requires a direct examination of the nature and content of their Internet communications to resolve it. Under such circumstances, courts have found sufficient minimum contacts to exercise specific jurisdiction over a case or controversy arising from those contacts.

Once sufficient minimum contacts have been established, the court turns to a determination of the reasonableness of subjecting the non-forum defendant to the jurisdiction of the forum. The appropriate factors include: ◆the forum state's interest in adjudicating the dispute; the plaintiffs interest in obtaining convenient and effective relief, at least when that interest is not adequately protected by the plaintiffs right to choose the forum; the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several states in furthering substantive social policies.◆ World Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 292 (1980).

*5 This Court agrees with the analysis of the court in *Zippo.* The contacts between the parties in this case began with RTI's solicitation on the Internet. The anticipated benefit from the Internet solicitation materialized in the form of defendant's expression of interest by electronic mail. The parties continued to communicate extensively through electronic mail, the goal of which was to combine their resources to form a new company for purposes of funding the development of RI's medical device technology. A continuing and long-term relationship was contemplated, as indicated by the non-binding letter of intent dated August 21, 1996. Even though their face-to-face meetings were out of state, the negotiations and discussions during those meetings were directed towards setting in motion a business operation that would have a significant commercial impact on Indiana. This Court finds that the intended object of the contacts by Falkson, Continental and Stone with RTI and with the State of Indiana were to transact business in Indiana.

The defendants' goal was to establish a corporate relationship with RTI so that it would become an ◆operating unit◆ of a newly formed public corporation. That corporation would be in control of the development of new business opportunities in Indiana, or have consequences in Indiana. Thus, the state's interest in adjudicating the dispute is very strong, as is the plaintiffs interest in obtaining convenient and effective relief. Given that RTI is a small, start-up operation that was in need of capitalization, and the defendants appeared to be venture capitalists, with adequate access to capital, and who were actively searching for business investment opportunities anywhere in the world when they discovered RTI's notice, it is quite reasonable to allow the plaintiff's choice of forum to prevail. The interstate judicial system's interest is met by allowing for an efficient resolution of the parties' controversy by an early determination of whether a contractual relationship was formed. Substantive social policies are furthered by allowing an in-state business to attempt to attract investment capital without fear that it will be required to litigate any disputes arising out of the attempt in a foreign jurisdiction. Customarily, a company that is in need of funds does not have the wherewithal to travel to a foreign state and litigate its disputes.

Also central to this suit is the control of certain intellectual property, and the fruits of applying its teaching to the

production of a useful item. The situs of that control is Indiana. For all these reasons, the Court finds that the commercial nature of the Internet activity between the parties was focused on Indiana. As mentioned above, the issue is not, as suggested by defendants' counsel, ◆who started it.◆ Neither is the matter disposed of by the fact that no defendant ever set foot in Indiana. The ◆footfalls◆ were not physical, they were electronic. They were, nonetheless, footfalls. The level of Internet activity in this case was significant

*6 Certainly, one or two inquiries about some Indiana goods or services would not support local jurisdiction. Here, however, the electronic mail messages were numerous and continuous over a period of months. The purpose of that activity was for the defendants and the plaintiff to unite in a joint venture to capitalize production of certain medical devices. Without question, Falkson, Continental and Stone reached beyond the boundaries of their own states to do business in Indiana. It is not unreasonable for them to be haled into an Indiana forum. The goal of their negotiations, to form a joint venture or public company with an Indiana citizen, thereby financing the development of Indiana based intellectual property, supports this finding. The exercise of jurisdiction in this case is proper. Defendants' motion to dismiss, as it relates to the alleged lack of personal jurisdiction is DENIED.

With respect to the defendants' allegation that this Court lacks subject matter jurisdiction because RTI has failed to prove an amount in controversy that exceeds $50,000.00, the Court finds that argument without merit. At this point in the litigation, it does not appear ◆to a legal certainty◆ that the tort claims by RTI will not exceed the required $50,000.00. See <u>Hunt v. Washington State Apple Advt.</u>, 432 U.S. 333, 346-47, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) (citing <u>St. Paul Mercury Indemnity Co. v. Red Cab. Co.</u>, 303 U.S. 283, 288-289, 58 S.Ct. 586, 82 L.Ed. 845 (1938)). ◆In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation.◆ <u>Id.</u> The object of the litigation is a contemplated contract calling for the assignment of certain patents and other intellectual property to the defendant, in exchange for a sum of money to repay third parties designated in RTI's business plan, and fees and salary to Brauner for a three-year period that easily exceeds the amount in controversy requirement. The motion to dismiss on that ground is also DENIED.

The defendants' charge that RTI abused the Declaratory Judgment Act in an effort to forum shop by winning the ◆race to the courthouse◆ also fails to support dismissal. A district court has discretion in deciding whether to grant declaratory relief, <u>Reno v. Catholic Social Serv., Inc.</u>, 509 U.S. 43, 113 S.Ct. 2485, 2495, 125 L.Ed.2d 38 (1993), the purpose of which so that a party who is uncertain of his or her rights can avoid the accrual of damages while waiting for an adversary to bring suit. <u>Nucor v. Aceros Y Maquilas De Occidente</u>, 28 F.3d 572, 577 (7th Cir.1994). Declaratory relief is proper when there is an ◆actual, substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant◆ such relief. <u>Id.</u> In <u>Nucor,</u> the court noted that a letter threatening to sue Nucor under a Texas deceptive trade practices law was sufficient threat to justify Nucor's seeking an earlier resolution of the dispute about whether the parties had an enforceable contract. <u>Id.</u> At 578. Here, with a letter from the alleged attorney for the defendants threatening a lawsuit if the issues were not resolved within three days was more than enough evidence of an actual and substantial controversy between the parties, whose legal interests were adverse. The uncertainty held by RTI as to whether the parties had an enforceable contract, and the consequences in terms of financing his company and retaining his assets, justified the use of the Declaratory Judgment Act to invoke this Court's jurisdiction. The motion to dismiss is DENIED on this ground as well.

*7 Finally, the defendant's request for a transfer of venue is without merit. Nothing presented by the defendant has convinced this Court that the choice of venue in the Southern District of New York will be clearly more convenient for the parties than the Southern District of Indiana. See <u>Enviroplan, Inc. v. Western Farmers Elec. Coop.</u>, 900 F.Supp. 1055, 1064 (S.D.Ind.1995). At most a transfer would merely transfer the inconvenience from the defendants to the plaintiff. Thus, the alternative motion for transfer is OVERRULED.

IT IS SO ORDERED this day of March 1997.

S.D.Ind.,1997.
Resuscitation Technologies, Inc. v. Continental Health Care Corp.
Not Reported in F.Supp., 1997 WL 148567 (S.D.Ind.), 65 USLW 2694

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

KRONENBERGER HANLEY, LLP
220 Montgomery Street, Suite 1920
San Francisco, CA 94104
www.KronenbergerLaw.com

| | |
|---|---|
| 1 | **PROOF OF SERVICE** |
| 2 | I am a resident of the state of California, over the age of eighteen years and not a party to this action.  My business address is 220 Montgomery Street, Suite 1920, San Francisco, California, 94104. |
| 3 | |
| 4 | On March 6, 2006, I served the following document(s): |
| 5 | **1. CONSOLIDATED OPPOSITION TO DEFENDANT DAVID L. FREDRICK'S, MOTION TO DISMISS PLAINTIFF'S COMPLAINT, AND DEFENDANT PATRICIA HOUGH'S, AND DEFENDANT AAIMG'S MOTION TO DISMISS THE SECOND, THIRD, FIFTH AND SIXTH CLAIM; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |
| 6 | |
| 7 | |
| 8 | on the parties listed below as follows: |
| 9 | **NATHAN REINMILLER, ESQ** |
| 10 | Alverson Taylor Mortensen & Sanders
7401 West Charleston Blvd
Las Vegas, NV 89117 |
| 11 | Fax: (702) 385-7000 |

| | | |
|---|---|---|
| 12 | | |
| 13 | [X] | BY FACSIMILE MACHINE (FAX), by personally transmitting a true copy thereof via an electronic facsimile machine to the fax number listed herein. |
| 14 | [ ] | BY FIRST CLASS MAIL, by placing a true copy thereof in a sealed envelope, with postage thereon fully prepaid, for collection and mailing, in San Francisco, California, following ordinary business practices, which is deposited with the US Postal Service the same day as it is placed for processing. |
| 15 | | |
| 16 | | |
| 17 | [ ] | BY PERSONAL SERVICE, by personally delivering a true copy thereof to the addresse(s) listed herein at the location listed herein. |
| 18 | | |
| 19 | [X] | BY OVERNIGHT DELIVERY containing a true copy thereof to the addresse(s) listed herein at the location listed herein. |
| 20 | [ ] | BY EMAIL to the addresses listed above. |
| 21 | | |
| 22 | [ ] | (State) I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. |
| 23 | [X] | (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made. |
| 24 | | |
| 25 | | |
| 26 | | *Jonathan S. Tam* |
| 27 | | |
| 28 | | |

1

PROOF OF SERVICE

**EXHIBIT E**
Declaration of Karl Kronenberger in Support of Plaintiff's Consolidated Opposition to Defendant David L. Fredrick's Motion to Dismiss Plaintiff's Complaint and Defendant Patricia Hough's, and Defendant AAIMG's Motion to Dismiss the Second, Third, Fifth and Sixth Claim,
filed by Plaintiff St. Matthew's University (Cayman Ltd.) on March 7, 2006

**GREENBERG TRAURIG LLP**
Mark G. Tratos (Bar No. 1086)
F. Christopher Austin (Bar No. 6559)
Ronald D. Green, Jr. (Bar No. 7360)
3773 Howard Hughes Parkway, Ste. 500 N
Las Vegas, Nevada 89109
Tel: (702) 792-3773
Fax: (702) 792-9002

**KRONENBERGER HANLEY, LLP**
Karl S. Kronenberger (CA Bar No. 226112)
Terri R. Hanley (CA Bar No. 199811)
220 Montgomery Street, Suite 1920
San Francisco, CA 94104
Telephone: (415) 955-1155
Facsimile: (415) 955-1158

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEVADA

| | |
|---|---|
| **ST. MATTHEW'S UNIVERSITY (CAYMAN) LTD.**, a Cayman Islands company,<br><br>Plaintiff,<br><br>vs.<br><br>**SABA UNIVERSITY SCHOOL OF MEDICINE FOUNDATION**, a Netherland-Antilles company, et al,<br><br>Defendants. | Case No. CV-S-05-0848-BES<br><br>**DECLARATION OF KARL KRONENBERGER IN SUPPORT OF PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANT DAVID L. FREDRICK'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT, AND DEFENDANT PATRICIA HOUGH'S, AND DEFENDANT AAIMG'S MOTION TO DISMISS THE SECOND, THIRD, FIFTH AND SIXTH CLAIM**<br><br>**FILED UNDER SEAL** |

1

**DECLARATION OF KARL KRONENBERGER**

I, Karl S. Kronenberger, counsel of record for Plaintiff St. Matthew's University School of Medicine ("ST. MATTHEW'S") in the above-captioned action, do hereby affirm and declare that true and correct copies of the following documents are attached to ST. MATTHEWS' CONSOLIDATED OPPOSITION TO DEFENDANT DAVID L. FREDRICK'S, MOTION TO DISMISS PLAINTIFF'S COMPLAINT, AND DEFENDANT PATRICIA HOUGH'S, AND DEFENDANT AAIMG'S MOTION TO DISMISS THE SECOND, THIRD, FIFTH AND SIXTH CLAIM, as the exhibits indicated:

1. At Exhibit A, account information for the email accounts presaaimg@hotmail.com and execsecaaimg@hotmail.com, from documents received from Microsoft Corporation, which is the operator of Hotmail. Additionally, Exhibit A contains one full page of IP addresses, dates and times of account logins for one of these Hotmail accounts. The documents in Exhibit A reflect only a portion of the documents provided to Plaintiff by Microsoft, and the documents have been annotated by Plaintiff for the purpose of Plaintiff's opposition to Defendants' Motion to Dismiss. The pages included in Exhibit A are true and accurate copies of the corresponding original pages Plaintiff received from Microsoft Corporation in response to Plaintiff's subpoena.

2. At Exhibit B, information on the IP addresses from the annotation in Exhibit A, from documents provided by Level3 Communications, LLC, which owns the IP addresses reflected at the annotation in Exhibit A. Specifically, this information from Level3 Communications contains a listing of the usage of three of the IP addresses, matching the Hotmail login IP addresses, dates and times.[1] This information from Level3 Communications shows that the username saba@tiac.net was used to log in for Internet access, and that the telephone number used to dial in to the Internet connection was (978) 632-6836. The documents in Exhibit B reflect only a portion of the documents provided to Plaintiff by Level3 Communications, and the documents have

---

[1] For conversions for UTC time (formerly known at GMT), see http://www.time.gov and http://www.time.gov/about.html.

2      **DECLARATION OF KARL KRONENBERGER**

1  been annotated by Plaintiff for the purpose of Plaintiff's opposition to Defendants'
2  Motions to Dismiss.  The pages included in Exhibit B are true and accurate copies of the
3  corresponding original pages Plaintiff received from Level3 Communications in
4  response to Plaintiff's subpoena.

5      3.     At Exhibit C, information from Earthlink on the account associated with the
6  email address saba@tiac.net, which is an email address provided by Earthlink.  The
7  account information provided by Earthlink reveals the names David Fredrick and Saba
8  University as owners and operators of the account, and the security word is the
9  "Father's Middle Name" of the account owner.  The documents in Exhibit C reflect only
10 a portion of the documents provided to Plaintiff by Earthlink, and the documents have
11 been annotated by Plaintiff for the purpose of Plaintiff's opposition to Defendants'
12 Motion to Dismiss, and portions have been redacted for privacy reasons.  Except for the
13 redactions, the pages included in Exhibit C are true and accurate copies of the
14 corresponding original pages Plaintiff received from Earthlink in response to Plaintiff's
15 subpoena.

16     4.     At Exhibit D, information from Verizon on the ownership information for the
17 telephone number (978) 632-6836.  The account information provided by Verizon
18 reveals that the telephone number (978) 632-6836 is located at 74 Edgell Road,
19 Gardner, MA 01440, which is Defendant FREDRICK'S residence.  The account
20 information further reveals that the telephone number is registered to Defendant Patricia
21 Hough, the wife of FREDRICK.  The documents in Exhibit D reflect only a portion of the
22 documents provided to Plaintiff by Verizon, and the documents have been annotated by
23 Plaintiff for the purpose of Plaintiff's opposition to Defendants' Motion to Dismiss.  The
24 social security number of Defendant HOUGH has been redacted.  Except for the
25 redactions, the pages included in Exhibit D are true and accurate copies of the
26 corresponding original pages Plaintiff received from Verizon in response to Plaintiff's
27 subpoena.
28

1  5. At Exhibit E, several pages from a deposition of FREDRICK taken on
2  October 27, 2004, related to current litigation in the State of Massachusetts, wherein
3  FREDRICK states that he lives at 74 Edgell Road, Gardner, MA 01440, where the
4  phone number (978) 632-6836 is located.  The documents in Exhibit E reflect only a
5  portion of the full deposition of FREDRICK that is in the possession of Plaintiff.  The
6  pages included in Exhibit E are true and accurate copies of the corresponding original
7  pages of the copy of the deposition that Plaintiff possesses.
8  6. At Exhibit F, copies of two cases cited in Plaintiff's opposition that are
9  published only in the Westlaw system.

11  I swear and affirm under penalty of perjury that the above information is true and
12  correct.

14  Dated: March 6, 2006.

16  By: *Karl S. Kronenberger* (signature)
17  Karl S. Kronenberger

4

**DECLARATION OF KARL KRONENBERGER**

# PROOF OF SERVICE

I am a resident of the state of California, over the age of eighteen years and not a party to this action. My business address is 220 Montgomery Street, Suite 1920, San Francisco, California, 94104.

On March 6, 2006, I served the following document(s):

1. DECLARATION OF KARL KRONENBERGER IN SUPPORT OF PLAINTIFF'S CONSOLIDATED OPPOSITION TO DEFENDANT DAVID L. FREDRICK'S, MOTION TO DISMISS PLAINTIFF'S COMPLAINT, AND DEFENDANT PATRICIA HOUGH'S, AND DEFENDANT AAIMG'S MOTION TO DISMISS THE SECOND, THIRD, FIFTH AND SIXTH CLAIM

on the parties listed below as follows:

NATHAN REINMILLER, ESQ
Alverson Taylor Mortensen & Sanders
7401 West Charleston Blvd
Las Vegas, NV 89117
Fax: (702) 385-7000

[X] BY FACSIMILE MACHINE (FAX), by personally transmitting a true copy thereof via an electronic facsimile machine to the fax number listed herein.

[ ] BY FIRST CLASS MAIL, by placing a true copy thereof in a sealed envelope, with postage thereon fully prepaid, for collection and mailing, in San Francisco, California, following ordinary business practices, which is deposited with the US Postal Service the same day as it is placed for processing.

[ ] BY PERSONAL SERVICE, by personally delivering a true copy thereof to the addresse(s) listed herein at the location listed herein.

[X] BY OVERNIGHT DELIVERY containing a true copy thereof to the addresse(s) listed herein at the location listed herein.

[ ] BY EMAIL to the addresses listed above.

[ ] (State) I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

[X] (Federal) I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Jonathan S. Tam

PROOF OF SERVICE

1

**EXHIBIT F**
Reply of David L. Fredrick to Plaintiff's Opposition to Defendant David L. Fredrick's
Motion to Dismiss Plaintiff's Amended Complaint filed on March 20, 2006